**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DONALD H. MacDERMID, individually and as Administrator of the Estate of NINA KAY MacDERMID,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **CASE NO. 1:03-0111** |
| | ) | **JUDGE KNOWLES** |
| **DISCOVER FINANCIAL SERVICES, d/b/a DISCOVER CHARGE CARD,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. Introduction and Background**

This matter is before the Court upon Defendant's Motion for Summary Judgment. Docket No. 51. Defendant has filed a supporting Memorandum of Law (Docket No. 55), the Deposition of Plaintiff with Exhibits (Docket Nos. 52, 53, 54) and certain medical records of decedent (Docket Nos. 51-2, 51-3). Defendant has also submitted a Statement of Material Facts (Docket No. 56), to which Plaintiff has responded (Docket No. 58).

Plaintiff has filed a Response in Opposition to the Motion (Docket No. 57), a supporting Legal Memorandum (Docket No. 59), the Affidavit of Dr. John Koomen (Docket No. 60), and Plaintiff's own Affidavit (Docket No. 61).

Plaintiff filed this action individually and as the administrator of the estate of his deceased spouse, alleging, (1) "Outrageous Conduct and Intentional Infliction of Emotional

Distress"; (2) "Violation of the Tennessee Consumer Protection Act"; (3) "Fraud and Civil Extortion"; and (4) "Violation of the Fair Debt Collection Practices Act and Common Law Credit Defamation/Libel." *See* Docket Entry No. 1. *Id.*

The gist of Plaintiff's Complaint is that Defendant violated state and federal law in attempting to collect the balances due on several credit cards that were obtained by decedent in Plaintiff's name, and that Defendant's alleged wrongful conduct in attempting to collect the balance of those accounts was the proximate cause of decedent's subsequent suicide. Essentially, Plaintiff avers that decedent, Nina Kay MacDermid, had previously suffered from "a particularly severe form of bi-polar mental disorder," which manifested "with intermittent episodes of manic spending, often for unusual and non-essential merchandise." *Id.* Plaintiff avers that decedent had made substantial gains in her illness, but that at some point in 2001, decedent submitted a personal application for a credit card via the Internet, seeking a Discover credit card from Defendant. Decedent apparently submitted her husband's name as a co-applicant, without his knowledge or permission.

Plaintiff avers that Defendant issued credit cards to decedent, and that she quickly spent $15,000 "for various bizarre purchases, including expensive, exotic cats." *Id.* Defendant allegedly attempted to collect the amounts due on the credit card accounts from Plaintiff, whereupon he protested that he had never applied for, nor authorized his wife to apply for, Discovery credit cards in his name. Plaintiff avers that, as result of Defendant's attempts to collect the balances due on the credit cards, and because of her fear of being criminally prosecuted for failing to pay the amounts due, decedent committed suicide on June 13, 2003. *Id.*

Specifically, Plaintiff's Complaint avers that Defendant engaged in outrageous conduct

"in using false descriptions of the law; threats of criminal prosecution; and threats of embarrassment and civil suit against both the Plaintiff, and his deceased wife, in an attempt to force the parties' payment of a debt which, at best, was only civilly chargeable to Mrs. MacDermid." *Id*. Plaintiff further maintains that, "Defendant's practice of soliciting, and processing, purported binding credit applications by the Internet, with no mechanism . . . for obtaining a signature of all purported obligors, is a practice which intentionally and routinely violates the provisions of the Tennessee Statute of Frauds," and "constitutes a purposeful and willful violation of Tennessee law, which is likely to, and in fact, does cause confusion and deception to the consumer, and is an inherently deceptive practice." *Id*. Plaintiff also contends that, "Defendant's threat of criminal prosecution, in aid of its efforts to collect an unlawful debt, constitutes civil extortion, and is a violation of the Fair Debt Collection Act." *Id.* Plaintiff additionally argues that, "Defendant's repeated and (legally incorrect) statements that the Plaintiff was obligated for the debt which he properly refused to pay unfairly and illegally caused harm to his credit and to his general business reputation." *Id.* Finally, Plaintiff maintains that, "since Plaintiff Don H. MacDermid never signed, or reviewed, any application which contained the federally mandated disclosures set forth in the Truth in Lending Act . . . the Defendant's efforts to impose civil liability on the Plaintiff, and their statement to merchants and other persons affirming the validity of the debt, constitute violations of the Federal Truth in Lending Regulations . . . ." *Id.* Plaintiff seeks one million five hundred thousand dollars ($1,500,000.00) in compensatory damages, two hundred fifty million dollars ($250,000,000.00) in punitive damages, as well as treble damages, and attorney's fees. *Id.*

Defendant previously filed a Motion to Dismiss Plaintiff's claims. Docket No. 9. In a

Memorandum Opinion entered September 20, 2004, the Court dismissed Plaintiff's claims concerning outrageous conduct/intentional infliction of emotional distress, Tennessee Consumer Protection Act, fraud, civil extortion, Fair Debt Collection Practices Act, and Truth In Lending Act. The Court also granted the Motion concerning Plaintiff's credit defamation/libel claim, to the extent that that claim pertained to credit reporting agencies. The Court allowed that claim to proceed, however, to the extent that it pertained to third persons other than credit reporting agencies.

The Court, however, denied the Motion with respect to Plaintiff's wrongful death claim. The Court essentially held that, because it was required to take the allegations of Plaintiff's Complaint and Amended Complaint in the light most favorable to Plaintiff, and to accept all well-pleaded allegations of fact as being true, the wrongful death claim could survive the Motion to Dismiss. The Court stated in pertinent part as follows:

> For the purposes of the instant Motion to Dismiss, therefore, Plaintiff informed Defendant of decedent's debilitated physical and mental condition; Plaintiff informed Defendant that decedent's debilitated condition was directly caused by Defendant's actions; Defendant continued its collection efforts; Decedent's condition worsened to the point of requiring psychiatric hospitalization; Decedent took her own life; and, *at the time of her suicide, decedent did not understand the nature of her actions.*

Docket No. 19, p. 13 (emphasis added).

In the instant Motion, Defendant asks the Court to revisit this issue, but this time with the benefit of a number of undisputed facts that have been developed in discovery. Defendant also seeks summary judgment concerning Plaintiff's credit defamation/libel claim.

## **II. Undisputed Facts**

The following facts are undisputed.[1]

In August 2002, Nina Kay MacDermid, using the "family computer" located upstairs in the home which she shared with her husband, Donald H. MacDermid, went on-line to the Discover Card web site and filled out an application requesting a credit card. She provided her personal information as well as personal information of her husband, like his Social Security number. She submitted the application for her husband as the primary card holder and herself as an authorized buyer.

Subsequently, Mrs. MacDermid went on-line again in August and then in September and applied for two more Discover cards in her husband's name, providing Discover with his personal information and requesting that the cards be issued with him as the primary card holder and her as an authorized buyer. In order to be able to receive these credit cards from Discover without her husband's knowledge, she obtained a post office box in Linville, Tennessee. These cards were subsequently issued to her and she was able to intercept them and use them without her husband's knowledge.[2]

Mrs. MacDermid made numerous purchases using her Discover cards. These purchases ranged from every day necessities such as gas and computer products to exotic cats.

---

[1] These facts are set out in Defendant's Memorandum in Support of its Motion for Summary Judgment and in Plaintiff's Responses to Defendant's Statement of Material Facts. With regard to the facts set forth in Defendant's supporting Memorandum, Plaintiff has not disputed any of those facts in his Response to the Motion for Summary Judgment. Additionally, Defendant submitted 39 material facts in support of its Motion for Summary Judgment, only one of which (No. 30) was denied, and that fact was denied "as an excerpt out of context." *See* note 3, *infra*.

[2] Defendant accepts as true, for the purposes of the Motion for Summary Judgment, Mr. MacDermid's statement that he did not authorize any of these cards and that he did not know about the existence of any of these Discover cards issued in his name until February 2003.

Unbeknownst to Discover, Mrs. MacDermid had a long history of mental illness. She had been diagnosed in the early 1990's as having bipolar disease and being manic depressive. She underwent drug and alcohol counseling at Parthenon Pavilion (a Nashville psychiatric hospital) in the early 1990's. According to her husband, she continued to struggle with drug and alcohol problems into their marriage.

Mrs. MacDermid also had a history of manic spending sprees. She had previously run up credit card debt requiring her to file personal bankruptcy in the late 1990's. After her discharge from bankruptcy, her husband, who had helped her by paying off some of her debts, forbade her from having any credit cards.

After her bankruptcy, Mrs. MacDermid was on a "cash only basis." She was not working, and her husband would provide her with money for purchases which he felt were warranted. Hence, she surreptitiously obtained not only these three Discover cards, but also cards from American Express, Household Bank, and Chase, among others. According to Mr. MacDermid, his wife obtained all of these credit cards essentially the same way that she did the Discover cards (*i.e.*, without his knowledge, and in his name, using his personal information).

On February 14, 2003, Mr. MacDermid intercepted checks which had been sent to his residence by Discover. Mr. MacDermid confronted his wife about these checks and she denied having any knowledge of them. He admits that he was angry. In his notes concerning the incident, Mr. MacDermid states that he had a "stressful confrontation" with his wife. He explained in his deposition that, "It was, you know . . . to my knowledge, I confronted her with it and that would be stressful to her, very stressful, under the circumstances."

Two days later, Mr. MacDermid found his wife in bed "in a near death condition." Mrs.

MacDermid was admitted to Maury Regional Hospital on February 16, 2003, where she remained for five days until her discharge on February 21, 2003. The medical records list her discharge diagnosis as "acute narcotic overdose" and "anoxic brain injury." The records also indicate that she had "battled bipolar disease for about a decade."

Shortly after his wife was admitted to the hospital, Mr. MacDermid "went through [his wife's] stuff" when he "got back home from the hospital." He found a number of credit cards and statements showing that she was delinquent on a number of different credit cards.

After Mr. MacDermid found these credit cards he "cancelled them." He "called each one and cancelled them and wrote letters to each one."

On March 1, 2003, Mr. MacDermid wrote a letter to Discover Financial Services. A true and correct copy of this letter is attached to the transcript of Mr. MacDermid's deposition as Exhibit 14. This letter states in pertinent part as follows:

> This is to confirm that the credit cards noted above, or any other credit instrument in my name to you, is not and has never been authorized nor requested by me. I was unaware of the cards, or you listing me as cardholder. I have not used them. I have not benefitted from it in any way, to the best of my knowledge.

In this letter, Mr. MacDermid also states that "I have never signed any request, authorization to open, or authorization for anyone else to obtain or use your cards."

Mr. MacDermid does not dispute the fact that his wife obtained these Discover cards and purchased goods with them. He also admits that she was ultimately responsible for paying them.

After Mrs. MacDermid was released from the hospital, she was under the care and supervision of psychiatrist Dr. John Koomen. On Wednesday, June 11, 2003, two days before she committed suicide, she visited with Dr. Koomen. Sometime around that visit, she purchased

a handgun. On June 13, 2003, Mrs. MacDermid used this newly-purchased handgun to commit suicide.

Mrs. MacDermid hand wrote a note for her husband, which Mr. MacDermid found after she had killed herself. This note, which is undated, states as follows:

> Dear Don,
>
> The pressure just got the best of me. I got to where I could not even function any more. I am so sorry I let the house go, and everything, please forgive me. I really do love you, but I just cannot take this kind of pressure, and humiliation any longer. I am so sorry for all the worry I have caused you Don, I just wish we were back at the old church once again. I really do love you. I am so sorry to do this to us, but I am not me any more Don. I do not want to take your money either. We should have spent more time together, some vacations, and not all work. I stayed here by myself way too much. I feel like I am having a nervous breakdown. I keep the shakes all the time, and numbness all through my body and paranoid, that is no way to live. I will always love you, your wife Kay.

Mr. MacDermid testified that he was shocked and surprised by his wife's suicide. He testified that she did not act any differently in the weeks leading up to her suicide.[3] Mr.

---

[3] The statement, "He testified that she did not act any differently in the weeks leading up to her suicide" was set forth as Item No. 30 in Defendant's Statement of Material Facts. Plaintiff denied this Statement of Fact "as an excerpt out of context." Docket No. 58, p. 8. The Court notes, however, that Plaintiff testified as follows in his deposition:

> Q. [BY MR. CAREY] Did your wife act any differently than she had in the day or two days prior to her suicide?
>
> A. Immediately before? No. You know. I couldn't detect anything going on.
>
> Q. So as far as you could detect, your wife was acting the same as she had been for months?
>
> A. Yeah. Perhaps a little more relaxed. And that's typical, which

MacDermid did notice that his wife was "perhaps a little more relaxed." She did not have any conversation with him that, in hindsight, he thinks was out of character, or that indicated she was contemplating suicide or trying to say goodbye. Mr. MacDermid plainly admitted that "I didn't see it coming. I'll put it that way, in my own perspective."

Mr. MacDermid did not think that her friends or family foresaw that she was going to commit suicide. He testified that certainly if his wife's mother thought that she would commit suicide, then her mother would have done something about it.

Mr. MacDermid was not specifically warned by Dr. Koomen, his wife's treating psychiatrist, that suicide was an imminent threat. Dr. Koomen did not tell Mr. MacDermid to take any specific precautionary measures to prevent his wife from taking her own life. Mr. MacDermid had a number of guns, including handguns, in the house, all of which were fully accessible to his wife. Dr. Koomen did not suggest to Mr. MacDermid that he should not have guns in the house.

In addition, Mrs. MacDermid had full access to all of her medication and was administering all of her medication herself, even though she had been hospitalized in February for an "acute narcotic overdose." Mr. MacDermid stated that he "wasn't really looking for a suicide." Mr. MacDermid further explained, "Nobody saw it coming to the extent that they would, you know, overtly do something about it, which would be saying, you know, Hey, you're in danger. I didn't see it. Nobody else did."

The last contact that Mr. MacDermid had with anyone from Discover was "probably a

---

I didn't know.

Docket No. 53-3, p. 4-5 (Deposition page numbers 146-47).

phone call . . . at least a week or two weeks prior to [the] suicide." Although he was not positive, Mr. MacDermid thought that the last contact that either he or his wife had with Discover was some time in May 2003.

Plaintiff has submitted the Affidavit of Dr. Koomen, which states in pertinent part as follows:

> As my attached hand-written notes indicate, Ms. MacDermid was primarily concerned by the recent allegation by a credit card creditor that she had been guilty of "credit card fraud." That reference appears on pages one (1) and two (2) of the "Initial Psychiatric Assessment" conducted by me at the commencement of my evaluation and treatment of Ms. MacDermid [which is dated 3/6/03].
>
> During my initial interviews with Ms. MacDermid and in the ensuing weeks through April and May of 2003, Ms. MacDermid voiced apprehension over the allegations against her by the credit card company which was accusing her of credit card fraud. She was terrified at the prospect of going to jail and causing further embarrassment to her family, particularly her husband. While I did not discuss the specifics of the threats of jail with Ms. MacDermid, I note that she was preoccupied with the allegations of credit card fraud, and that it appeared to be the primary stressor which contributed to the deterioration of her emotional and mental condition in April and May of 2003. Subsequent to her self-inflicted gunshot death on June 13, 2003, it was reported to me by Mr. Don MacDermid, her husband, that she had just been threatened with immediate jailing by credit representatives of Discover Card, and that her fear and embarrassment related to the threat of incarceration appeared to be paramount in the voiced fears which led to her suicide.
>
> . . .
>
> Based upon my review of the psychiatric records of Nina Kay MacDermid, my personal involvement in her psychiatric care from March of 2003 through the date of her death in June 2003, and upon the history of the threat of immediate jailing by collection agents for Discover Card, it is my opinion that it is more probable than not, within reasonable medical certainty, that the significant precipitating factor in the causation of the death of Nina Kay

> MacDermid were the threats of criminal fraud prosecution and incarceration by the collection representatives. In the absence of the threats of arrest and incarceration, I believe that it is more probable than not, within reasonable medical certainty, that Ms. MacDermid could have maintained her rational thought processes, and the condition could have been stabilized, as it had many times in the past, through continued counseling and appropriate medication. My office provided appropriate care, supervision, and treatment to Nina Kay MacDermid throughout our relationship with Ms. MacDermid. All care provided by my office, and under my supervision, was consistent with the local standard of care in the Columbia, Maury County, Tennessee medical community.

## III. Summary Judgment Standards

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To prevail, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 202 (1986); *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the non-moving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a non-moving party, however, fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial, there is

no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23; *Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).

## **IV. The Wrongful Death Claim**

Plaintiff's claim for wrongful death is based upon a theory of negligence.[4] In order to establish a prima facie claim of negligence under Tennessee law, Plaintiff must prove the following elements: (1) a duty of care owed by Defendant to Plaintiff; (2) conduct by Defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Coln v. City of Savannah*, 966 S.W.2d 34-39 (Tenn. 1998) (citation omitted). Defendant argues that Plaintiff cannot prove either breach of duty or proximate cause. The Court need not address the breach of duty question, however, because the Court agrees that Plaintiff cannot establish proximate cause.

The concept of "proximate" or "legal" cause is a judicial mechanism by which courts "establish a boundary of legal liability." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn 1993). *See also Rains v. Bend of the River*, 124 S.W.3d 580, 592 (Tenn. Ct. App. 2003). This policy decision is based on considerations of "logic, common sense, policy, precedent and other more or less inadequately expressed ideas of what justice demands and of what is administratively

[4] While Plaintiff never specifically mentions "negligence" in his Complaint, he clearly seeks to recover for the wrongful death of his wife. Because Plaintiff never avers in his Complaint that Defendant intentionally killed decedent, his wrongful death claim must be based upon a theory of negligence. Plaintiff's Response to the instant Motion for Summary Judgment (Docket No. 59) does not dispute the fact that this claim is based upon negligence.



Case 1:03-cv-00111 Document 69 Filed 05/12/06 Page 12 of 19 PageID #: 561

possible and convenient." *Rains*, 124 S.W.3d at 592 (citing *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 n.6 (Tenn. 1997)). Generally stated, proximate cause is established if "the conduct is a substantial factor in bringing about the harm and there is no rule of law relieving the actor from liability." *Id*. (citing *Smith v. Gore*, 728 S.W.2d 738, 749 (Tenn. 1987); *Waste Mgmt., Inc. of Tenn. v. South Cent. Bell Tel. Co.*, 15 S.W.3d 425, 431 (Tenn. Ct. App. 1997); *RESTATEMENT (SECOND) OF TORTS* § 431 (1965)).

Tennessee courts have considered the issue of proximate cause in a number of cases involving suicide. In *Rains, supra*, the Tennessee Court of Appeals extensively discussed Tennessee case law concerning such cases. The Court summarized Tennessee law in this area, in part as follows:

> One of the rules of law that will relieve a negligent actor from liability is the doctrine of independent intervening cause. This doctrine, which survived the Tennessee Supreme Court's adoption of comparative fault, provides that a negligent actor will be relieved from liability when a new, independent and unforeseen cause intervenes to produce a result that the negligent actor could not have reasonably foreseen . . . . It is premised on the concept that the independent intervening cause breaks the chain of legal causation between the original negligent actor's conduct and the eventual injury . . . . The doctrine applies only when the intervening act (1) was sufficient by itself to cause the injury, (2) was not reasonably foreseeable to the negligent actor, and (3) was not a normal response to the negligent actor's conduct . . . .
>
> Foreseeability is the key here because no person is expected to protect against harms from events that he or she cannot reasonably anticipate or foresee or which are so unlikely to occur that the risk, although recognizable, would commonly be disregarded . . . . As a general matter, an actor has much less reason to anticipate intentional misconduct than negligence. . . . .Accordingly, the Tennessee Supreme Court has held that injuries are even less foreseeable when they result "from an act committed by the

> injured party so obviously fraught with peril as should be sufficient to deter one of reasonable intelligence." . . .
>
> Tennessee's courts, like other state and federal courts, have consistently recognized that the independent intervening cause doctrine may properly be invoked in cases involving self-inflicted injury or death. Like courts in other jurisdictions, they have also recognized the following three exceptions to this general rule: (1) circumstances in which the defendant's negligence causes delirium or insanity that results in self-destructive acts, . . . (2) custodial settings in which the custodian knew or had reason to know that the inmate or patient might engage in self destructive acts, . . . and (3) special relationships, such as a physician-patient relationship, when the caregiver knows or has reason to know that the patient might engage in self-destructive acts.

124 S.W.3d at 593-94 (citations and footnote omitted).

Plaintiff acknowledges the foregoing general rule and the exceptions to it.[5] Plaintiff relies upon the first exception discussed above. That exception, however, does not apply in the case at bar.

There is simply no medical proof in this case to show that Defendant's conduct caused a delirium or insanity in decedent. Dr. Koomen's Affidavit says nothing about "delirium," or "insanity." Despite Plaintiff's statement to the contrary, there is simply nothing in Dr. Koomen's Affidavit to support the proposition that Defendant's threats of prosecution and jail "caused a significant deterioration in [Plaintiff's] rational thought process." Likewise, there is nothing in Dr. Koomen's Affidavit showing that decedent was rendered "bereft of reason."

The *Rains* Court also discussed the importance of foreseeability in connection with independent intervening cause in cases involving suicide. Although Plaintiff does not discuss

---

[5] Plaintiff erroneously cites *White v. Lawrence*, 975 S.W.2d 525 (Tenn. 1998) as authority for these propositions.

the foreseeability issue as such, the Court believes it is appropriate to briefly address that issue.

The Tennessee Supreme Court, in *White v. Lawrence*, 975 S.W.2d 525 (Tenn. 1998), discussed independent intervening cause in a suicide case primarily in terms of foreseeability. *White* involved a situation in which Plaintiff's decedent sued a physician who had treated decedent for alcohol addiction and depression. The physician prescribed a drug to discourage decedent from drinking. Apparently, however, the physician instructed decedent's wife to grind the medication and surreptitiously place it in decedent's food. Shortly after decedent started taking the medication, he apparently began drinking, experienced pain and hot flashes, and went to a local emergency room. Because he did not know he had taken the medication that had been prescribed surreptitiously, he did not advise emergency room personnel of that fact. He was diagnosed as suffering from heat exhaustion and was discharged. Four hours later he committed suicide.

Plaintiff in *White* presented expert medical proof to support the proposition that the covert administration of the drug, under the circumstances, was "entirely inappropriate, violate[d] the standard of care, and [was] dangerous to the point of recklessness." 975 S.W.2d at 528. Under those circumstances, the *White* Court analyzed the issue as one of foreseeability, stating in pertinent part as follows:

> As the expert testimony in this case demonstrates, the foreseeability or likelihood of a suicide does not necessarily depend upon the mental capacity of the deceased at the time the suicide was committed. The fact that the deceased was not insane or bereft of reason does not necessarily lead to the conclusion that the suicide, which is the purported intervening cause, is unforeseeable. As our cases dealing with proximate or legal causation have indicated, the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. If so, the

> suicide is not an independent intervening cause breaking the chain of legal causation.
>
> . . .
>
> The record in this case shows that reasonable minds could conclude that the decedent's act of suicide was a foreseeable consequence of the defendant's negligence in surreptitiously prescribing and administering the [drug involved]. The record shows that leading risk factors for suicide include physical illness and depression. The decedent suffered from both. The plaintiff presented medical proof that the decedent's suicide was reasonably foreseeable from a medical standpoint, and that the defendant's conduct was a substantial factor in bringing about the suicide.

*Id.*

In the case at bar, there is absolutely no expert medical proof that decedent's suicide was a reasonably foreseeable result of any act or omission of Defendant.

## V. Credit Defamation

As discussed above, the Court previously dismissed Plaintiff's claims concerning "credit defamation" to the extent that those claims related to credit reporting agencies. The Court declined to dismiss the credit defamation claim, however, to the extent that Defendant may have made false statements to third persons (other than credit reporting agencies) that harmed Plaintiff's credit and general business reputation.

Defendant now seeks summary judgment on this claim, arguing that Plaintiff cannot establish a prima facie case of defamation. In order to establish a prima facie case of defamation, Plaintiff must show that: (1) Defendant published a statement; (2) with knowledge that the statement was false and defaming to Plaintiff; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *See Sullivan v. Baptist Memorial Hospital*, 995 S.W.2d 569, 57 (Tenn. 1999). As Defendant argues, Plaintiff

has not specifically set forth the exact statements Defendant allegedly made to third parties about him and/or his "credit" that were defamatory.

Plaintiff responds to this argument by relying upon the allegations of his Complaint. As discussed above, however, when a party makes a properly supported Motion for Summary Judgment, the opposing party cannot simply rely upon the allegations of his Complaint.

Defendant has clearly argued that Plaintiff cannot prove specific false statements made to third parties. Plaintiff simply has not responded to that argument with specific and concrete statements made to third parties.

Moreover, in both libel and slander actions, a plaintiff must prove actual injury unless constitutional malice is shown. *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn. 1978). Plaintiff has produced no evidence of any specific pecuniary losses as a result of any alleged defamation. Plaintiff completely fails to address *Nichols*, and Plaintiff has completely failed to show any pecuniary loss.

## VI. Possible Reinstatement of Dismissed Claims

In his Response to Defendant's Motion for Summary Judgment, Plaintiff apparently asks the Court to reconsider its previous decisions to dismiss Plaintiff's claims based upon intentional infliction of emotional distress and violation of the Tennessee Consumer Protection Act. (T.C.A. § 47-18-101 *et seq.*). Docket No. 59, p. 2. Plaintiff, however, has not filed a separate Motion asking the Court to reconsider these issues. As a practical matter, the Court would discourage litigants from seeking relief in legal memoranda, especially in legal memoranda that oppose a properly-filed Motion. If parties seek specific relief or a specific ruling from the Court concerning an issue, they should do so in a Motion. Even if the Court were to reconsider these

issues, however, the Court would not change its previous rulings.

Plaintiff never specifically addresses the issue of intentional infliction of emotional distress. Thus, the Court will decline to revisit its prior ruling on that issue.

Moreover, Plaintiff's argument concerning the Tennessee Consumer Protection Act appears to be that Defendant violated that Act by threatening criminal prosecution of decedent and/or Plaintiff himself. Docket No. 59, p. 13-14. This claim, however, is not the claim that was raised by Plaintiff in his Complaint in this case. In his Complaint, Plaintiff argued only that Defendant's practice of soliciting and processing binding credit applications by the Internet violated the Consumer Protection Act. Docket No. 1, p. 5-6. In reality, Plaintiff's argument is not that the Court should "reconsider" its previous ruling, because the Court's previous ruling had nothing to do with the claim Plaintiff now seeks to assert under the Tennessee Consumer Protection Act. Plaintiff has not filed a Motion to Amend his Complaint to allege such a claim, and the Court notes that the deadline for filing Motions to Amend was August 15, 2004. Docket No. 14, p. 4.

For the foregoing reasons, the Court respectfully declines to revise its prior decision dismissing Plaintiff's claims for intentional infliction of emotional distress and Plaintiff's claims under the Tennessee Consumer Protection Act.

## VII. Conclusion

For the foregoing reasons, the Court concludes that there is no genuine issue to any material fact, and that Defendant is entitled to a judgment as a matter of law with regard to Plaintiff's negligence/wrongful death and credit defamation claims.

An appropriate Order will be entered.

E. Clifton Knowles
United States Magistrate Judge



Case 1:03-cv-00111 Document 69 Filed 05/12/06 Page 19 of 19 PageID #: 568