# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DONALD H. MacDERMID, individually** | ) | |
| **and as Administrator of the Estate of** | ) | |
| **NINA KAY MacDERMID,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **CASE NO. 1:03-0111** |
| **vs.** | ) | **JUDGE KNOWLES** |
| | ) | |
| | ) | |
| **DISCOVER FINANCIAL SERVICES,** | ) | |
| **d/b/a DISCOVER CHARGE CARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I.  Introduction and Background

This matter is before the Court upon Defendant's Motion for Summary Judgment.

Docket No. 84.  In support of its Motion, Defendant has contemporaneously filed a

Memorandum of Law (Docket No. 85) and a Statement of Undisputed Facts (Docket No. 86).

Defendant has also filed excerpts of the Deposition of Donald MacDermid  (Docket No. 85-1),

numerous exhibits (Docket Nos. 85-2 - 85-5), and the Affidavits of Adonica Gilmore (Docket

No. 87) and two Affidavits of Valerie Kokoszka (Docket Nos. 88, 99).

Plaintiff has filed Responses to Defendant's Motion (Docket No. 91) and Statement of

Undisputed Facts (Docket No. 95).  Plaintiff has additionally filed his own Affidavit (Docket

No. 92), as well as the Affidavits of John Koomen (Docket No. 93), and Jeffrey Zych (Docket

No. 94), and the Deposition of Adonica Gilmore (Docket No. 90-1).

1

Defendant has filed a Reply.  Docket No. 98.

## II.  Facts

### A.  Allegations of Plaintiff's Complaint and Amended Complaint[1]

Plaintiff, Donald H. MacDermid, was the lawful spouse of the decedent, Nina Kay MacDermid.  For more than a decade, decedent suffered from a variety of physical and mental illnesses, including "a particularly severe form of bi-polar mental disorder, for which she remained under the care of various psychiatrists for several years."  Over the years, decedent had required repeated psychiatric hospitalizations, had undergone extended psychotherapy treatment, and had received various stabilizing medications.

Decedent's mental disorders manifested with intermittent episodes of "manic" and "aberrational" spending.  Following a bankruptcy that cleared decedent's "unmanageable debt load," decedent had "undertaken a program and plan, with her husband's assistance, which involved her avoidance of credit in any form, and her husband's management of her funds."  "Under those circumstances," decedent's mental condition and physical health improved; however, she continued to suffer from "some level of brain damage, apparently as a result of an earlier medication overdose, which manifested in both occasional seizures, and impaired reasoning and judgment."

At an unknown point in 2001, decedent submitted a personal application for a credit card issued by Defendant via the Internet.  Decedent submitted Plaintiff's name as a co-applicant, without Plaintiff's knowledge or permission.  Decedent was issued a credit card with a limit of

---

[1]The following "facts" are not in a form required by Fed. R. Civ. P. 56 and some may be disputed.  They are recited simply to provide contextual background.

approximately twenty-two thousand dollars ($22,000), and she "quickly" made approximately fifteen thousand dollars ($15,000) worth of "bizarre purchases, including expensive, exotic cats."

Plaintiff was "soon contacted by collection representatives of the Defendant, and advised that he was personally responsible for the account, since it had been procured by his wife, and he had been designated as the applicant, and that his wife was the co-applicant." Plaintiff argued that he never authorized, signed, or used the card, but was told that he was liable as a result of decedent's application, and that he would be held legally accountable for the charges.

Plaintiff explained decedent's "difficult history, and her limited judgment and reasoning abilities due to her mental illness" to Defendant's representatives. Defendant's representatives "repeatedly" represented to Plaintiff that "the only way he could avoid civil liability on the account would involve his filing a criminal report, alleging fraudulent conduct by his wife." Defendant "both subtly and expressly, conveyed the implication that [decedent] would be criminally prosecuted, and go to jail, if the account was not paid." Plaintiff was additionally advised that two small, local merchants would be "charged back," and that those merchants would likely pursue criminal fraud charges against decedent. No national merchants were charged back.

Plaintiff requested that Defendant "properly document the claim, and that it cease threats of criminal prosecution." Plaintiff asserts that decedent "suffered extreme terror at the prospect of being jailed," and that her physical and mental condition worsened as Defendant "charged back" charges to merchants.

Decedent's medical and mental conditions deteriorated rapidly, and she lost weight from 160 pounds to less than 115 pounds over the course of a few months. She developed physical

symptoms, including "an increase in her level of depression, brief periods of numbness, and an uncontrollable trembling of her entire body." Decedent sought medical attention for her deteriorating physical condition.

On April 9, 2003, after repeated attempts from Defendant's representatives to contact Plaintiff, Plaintiff returned Defendant's telephone calls, and spoke with employee Adonica Gilmore. Plaintiff recorded his conversation with Ms. Gilmore. During the course of that conversation, Ms. Gilmore relayed that, (1) "she had checked with the local District Attorney's office and had spoken with a lady named 'Harriott' who had told her that, under the facts described above, [Plaintiff] is legally liable for [decedent's] charge card"; (2) "she had filed a report with the Giles County Sheriff's office"; and (3) "Harriott Barkly, of the Giles County District Attorney's office, advised her that because the MacDermids were married, and because [Plaintiff] was aware of [decedent's] problems, he ... 'should keep a better eye on her,' and ... 'should keep her away from the Internet'." Plaintiff avers that Ms. Gilmore additionally stated, "I don't think you want her going ... well you know," and that, "if the matter could not be resolved, ... 'I'll just call Harriott' ... and have the authorities '...take a little trip out to your house.'" Plaintiff maintains that Ms. Gilmore advised him that, "there was no need for him to talk to a lawyer, because, even though there was no signature, and it was procured on the Internet, [decedent's] application is binding on [Plaintiff], and he is definitely liable."

The "conduct, threats and statements ... made by Defendant were persistent and increasing in frequency throughout the Spring of 2003 and were made to both Plaintiff and decedent." Decedent was "terrified" by Defendant's threats, and discussed those fears with friends and with Plaintiff.

4

Plaintiff repeatedly warned Defendant's agents of the "very severely debilitated mental and physical condition of the decedent and that the condition was caused by those collection efforts, specifically the implicit and, at times, explicit threat that decedent would be jailed if the subject debt was not quickly paid." Plaintiff warned Defendant's agents that their continued collection efforts, including threats of criminal prosecution, would lead to decedent's death or would otherwise "kill" her because of her debilitated mental and physical condition. "As a direct and proximate result of the Defendant's conduct, threats and statements ..., the decedent required psychiatric hospitalization only a few weeks before her untimely death."

On June 13, 2003, decedent committed suicide by a gunshot to her head.

**B. Undisputed Facts**[2]

In 2001, decedent submitted several applications via the internet seeking to obtain credit cards from Discover. Docket No. 95; Complaint ¶ 3. Decedent submitted Plaintiff's name as a co-applicant on the application "without his knowledge or permission." *Id.* Decedent provided her personal information, as well as Plaintiff's personal information, including his social security number. Docket No. 85-1, pp. 27-32.

Decedent subsequently applied, via the internet, for two additional Discover cards in Plaintiff's name, providing Discover with his personal information, and requesting that the cards be issued with him as the primary card holder and her as an authorized buyer. *Id.*

After receiving and approving the applications, Discover issued the requested credit cards to decedent. Docket No. 95; Complaint ¶ 3.

_____

[2]The following facts are in a form required by Fed. R. Civ. P. 56 or have been admitted by Plaintiff in his response to Defendant's Statement of Undisputed Material Facts (Docket No. 95) and are undisputed, except as otherwise noted.

5

The application contained on the Discover website contains terms of use, including a specific certification that the information being submitted is true and accurate. Docket No. 88, ¶ 4. An application requesting issuance of a Discover credit card in a party's name without that party's consent or knowledge would be in violation of the terms of use. *Id.*, ¶ 5.

Plaintiff first learned of the credit cards when he was later contacted by an employee in Discover's Collections Department regarding payment of the outstanding balances owed on the cards. Docket No. 95; Complaint ¶ 4. Plaintiff stated that he was not responsible for the charges because he never signed or granted verbal authorization to obtain the cards in his name and allegedly never used the cards. *Id.* On March 1, 2003, Plaintiff wrote a letter to Discover Financial Services that stated in pertinent part:

> This is to confirm that the credit cards noted above, or any other credit instrument in my name to you, is not and has never been authorized nor requested by me. I was not aware of the cards, or you listing me as a cardholder. I have not used them. I have not benefited [*sic*] from it in any way, to the best of my knowledge.
> . . .
> I have never signed any request, authorization to open, or authorization for anyone else to obtain or use your cards.

Docket Nos. 85-3, 85-1, Ex. 15.

Plaintiff does not dispute the fact that his wife obtained the Discover cards and purchased goods with them, or that she was ultimately responsible for paying the credit card bills. Docket No. 85-1, pp. 154-156.

Based upon Plaintiff's statements that he had not authorized or consented to his wife obtaining the credit cards in his name, a police report was filed. Docket No. 87, ¶¶ 4, 5, 6. A representative of Discover informed Plaintiff during a conversation, *inter alia*, that a police report had been filed. Docket No. 85-1, p. 26. Decedent overheard the conversation because

6

Plaintiff had the telephone on speakerphone. *Id.* Plaintiff told his wife, however, that he had gone to the Sheriff's Department and that the Sheriff's Department had told him that "there was no case" and that they would "do nothing about it." *Id.*, pp. 24-25. Plaintiff told his wife that she would not go to jail. *Id.*, p. 25.

Although not positive, Plaintiff recalled that the last contact that either he or his wife had with Discover was sometime in May 2003. *Id.*, p. 140. Decedent committed suicide on June 13, 2003. Docket No. 95, ¶ 6. Decedent left behind a handwritten note for Plaintiff, which he found after her death. Docket No. 85-1, p. 123. Decedent's handwritten note states as follows:

> Dear Don,
>
> The pressure just got the best of me. I got to where I could not even function any more. I am so sorry I let the house go, and everything, please forgive me. I really do love you, but I just cannot take this kind of pressure, and humiliation any longer. I am sorry for all the worry I have caused you Don, I just wish we were back at the old church once again. I really do love you. I am so sorry to do this to us, but I am not me any more Don. I do not want to take your money either. We should have spent more time together, some vacations, and not all work. I stayed here by myself way too much. I feel like I am having a nervous breakdown, I keep the shakes all the time, and numbness all through my body and paranoid, that is no way to live. I will always love you, your wife Kay.

Docket No. 85-2, Ex. 5. Decedent's note does not explicitly mention Discover, credit cards, collection efforts, threats of jail, or fear of incarceration. *See id.*

On February 28, 2006, Plaintiff filed his Affidavit (Docket No. 61) in response to a previous Motion for Summary Judgment filed by Defendant (Docket No. 51).[3] That Affidavit

---

[3] On January 25, 2008, Plaintiff filed the same Affidavit in response to the instant Motion for Summary Judgment (Docket No. 92).

states in pertinent part as follows:

[3.] I received three different letters from Discover (Adonica Gilmore, Linda Pack, and Elizabeth Moate), each demanding that I sign an affidavit to assist in commencing prosecution of my wife by DiscoverCard.

Both Nina and I were threatened by embarrassment in the local business community by "charge-backs" designed to drain small merchant bank accounts without notice, aggravated with the statements; . . . "true cardholder disputes the sale is fraud . . . they did not authorize or receive the merchandise. . . .   Please direct bill your customer. . . .  Pursue your remedies directly against the card member involved," (me).  Discover issued three separate credit cards in Nina's name with full knowledge that she had recently been through bankruptcy (ref. credit reports).  The criminal prosecution threats began immediately with the first contact in February, 2003.

In February, 2003, both Nina and I began receiving telephone calls from Discover credit personnel, demanding that <u>I</u> make full payment on the account.  I challenged the lawfulness of the issuance of the credit cards on grounds that neither Nina nor I had signed anything, and I had never used the cards.  The repeated reply by representatives of DiscoverCard (in conversations with both me and with my wife) was that Nina would be arrested and criminally prosecuted for "credit card fraud" if I refused to pay the approximate Fifteen Thousand and No/100 Dollar ($15,000.00) balance which had been placed on the account without my knowledge.  Through the period from February, 2003 through June of 2003, I received repeated aggressive and increasingly threatening telephone calls from an individual employed by DiscoverCard, Adonica Gilmore (and other representatives), beginning with first call estimated to be around February 20, 2003, while Nina was in the hospital.  On repeated occasions, I advised Ms. Gilmore (and the other callers) that the threats of criminal prosecution were terrifying my wife, and that I knew such threats were unlawful.  I described in detail my wife's bipolar disease, and emphasized that she was emotionally fragile and specifically that I was fearful that they "would kill her."  I demanded that the threats and telephone calls stop, but they intensified.  I tape-recorded several conversations.  Those tape-recordings contained: (1) my statements to DiscoverCard representatives (specifically, Adonica Gilmore and the others) that the debt was disputed and was not

lawful, for the reasons described above; (2) information that my wife's depression and bipolar disease was being worsened by the continued threats of criminal prosecution and jail; (3) their acknowledgment, following investigation, that I was ***not*** personally responsible for the account or the balance due (later stated in written correspondence); (4) ultimate demands that I ***should*** be responsible for paying the Fifteen Thousand and No/l00 Dollars ($15,000.00) amount because I had not properly "controlled" my wife.

4. Specifically, after I advised Adonica Gilmore and the other Discover employees of my wife's severe mental illness, and that I intended to continue taping our conversations if they continued to call, I received a letter from DiscoverCard dated April 3, 2003 acknowledging that, under the circumstances involved in the issuance of the card, I was not responsible for the account or its balance. Despite that written confirmation, the telephone calls and direct threats to me continued. On a date in May 2003, while my wife was present and heard the substance of the conversation, Adnoica Gilmore telephoned me with a "final demand" that I pay my wife's alleged debt, emphasizing that, despite her mental illness, I was "at fault" for not properly "controlling" her use of the internet to obtain the credit card. In that tape-recorded conversation (which has been provided to Defendant's attorneys), Adnoica Gilmore stated the following:

> (1) "You realize that we have filed a report with the Giles County Sheriff's Office;"
>
> (2) "The District Attorney told us that if you know your wife has a problem, you are responsible" (citing, as the source Harriett Barclay, who works for the District Attorney's Office);
>
> (3) That she had consulted with the District Attorney, who had told her that if we were married, and I was aware of the problem, I would be responsible for the debt since I "should keep a better eye on her;"
>
> (4) That I am personally responsible for the debt (in contrast to the earlier letter stated in the opposite);
>
> (5) "I don't think you want her going . . . well, you

9

know."

(6) That the lack of a signature or other direct
authorization by me did not affect my legal liability,
and that there was "no need" for me to take time to
talk to a lawyer;

(7) That "maybe I should keep my wife away from
the internet;"

(8) That if I would not agree to accept responsibility
for the debt, "I'll (Adonica Gilmore) just call
Harriett" . . . and will have the authorities ". . . take
a little trip out to your house."

Docket No. 61, p. 2-4.

### III.  The Sixth Circuit Decision

This case has previously been before the Sixth Circuit, and most of the significant facts

and the previous proceedings are fully discussed in the Sixth Circuit's opinion.  *See MacDermid*

*v. Discover Financial Services*, 488 F.3d 721 (6th Cir. 2007).   The undersigned had previously

entered Orders granting Defendant's Motion to Dismiss and an earlier Motion for Summary

Judgment, and dismissing all of Plaintiff's claims.  Docket Nos. 20, 70.  Plaintiff appealed those

dismissals to the Sixth Circuit, which affirmed all the dismissals, except for Plaintiff's

outrageous conduct claim.  In discussing that claim, the Sixth Circuit stated in part as follows:

Mr. MacDermid argues that Discover's conduct, as depicted in his
complaint, was at least sufficient to state a claim for outrageous
conduct under Tennessee law.  In particular, MacDermid asserts
that because Discover was on notice of his wife's "fragile mental
status," the company crossed the line between "excessive (but
permissible) pressure tactics" and "outrageous conduct which is
intended to cause harm that is disproportionate to the creditor's
right to seek payment."  Discover counters by noting that
Tennessee courts "have been very reluctant to find a creditor's
objectionable collection methods constitute outrageous conduct."
This is especially true, argues Discover, in situations where, as

10

here, the creditor is *actually owed* the debt in question, and where the debtor/decedent has *actually committed* credit card fraud by "unlawfully submitting" her husband's personal information over the internet to obtain the credit cards. The magistrate judge sided with Discover.

We cannot agree with this dismissal of the outrageous conduct claim at the 12(b)(6) stage. While Discover is correct that it was actually owed the debt in question, we disagree with its contention that Mrs. MacDermid was necessarily criminally liable for credit card fraud. As such, Mr. MacDermid has at least stated a claim for outrageous conduct based on Discover's threats of criminal prosecution for failure to pay a purely civil debt.

. . .

The Tennessee Supreme Court has stated that with respect to creditor/debtor interactions, "[t]he general rule is that a creditor has a right to urge payment of a *just debt*, and to threaten to resort to *proper legal procedure* to enforce the obligation. Hence, the creditor is not liable for a mental or emotional disturbance, or for a bodily injury or illness, as a result of his mere attempt, by reasonable means, to collect." *Moorhead v. J.C. Penney Co.*, 555 S.W.2d 713, 718 (Tenn. 1977) (emphasis added). Nevertheless, "improper methods used to collect a debt may be the basis for the maintenance of an action for a mental or emotional disturbance produced thereby, or for a bodily injury or illness resulting from such mental or emotional disturbance, especially where the circumstances attending the effort to collect the claim are such as to invoke the general rule that one who willfully or intentionally causes great emotional distress, *without justification*, is liable for such injury." *Id.*, (emphasis added).

. . .

Although *Moorhead* does not provide MacDermid with the firm footing he might have hoped, his claim has another, stronger leg to stand on. Namely, because his complaint alleges false threats by Discover employees of a *criminal prosecution* – i.e., words to the effect of, "if you don't pay up I'll have the district attorney take a little trip to your house" – his case may be distinguished from most

11

of the Tennessee authorities regarding creditors' attempts to collect a debt, justified or unjustified. Discover maintains that criminal prosecution of Ms. MacDermid was warranted because in his Complaint, Plaintiff admits that decedent committed credit card fraud by unlawfully submitting Plaintiff's personal information to obtain the credit cards from Discover by the internet." . . . Yet a wife's submission of her husband's name and social security number to obtain a credit card (which appears to have been all that was required in this instance), even if she does so without his permission, does not necessarily constitute fraud. It would seem that something beyond the pleadings is required for Discover to show that Ms. MacDermid had in fact committed fraud against the company – for example, via a copy of the on-line application and an explanation of the material misrepresentations contained therein. Alternatively, if Discover is somehow alleging that Ms. MacDermid committed fraud on her *husband* as opposed to the company, then we do not see how Discover could reasonably suggest to Mr. MacDermid that criminal fraud charges would be pursued against Mr. MacDermid on his behalf, unless of course he had consented to such action.[1]

To be sure, Tennessee's outrageous conduct standard, as in many states, is a formidable one. "To qualify as outrageous, conduct must be 'so outrageous in character, and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [i]ntolerable in a civilized community. *Doe 1 v. Roman Catholic Diocese of Nashville,* 154 S.W.3d 22, 39 (Tenn. 2005) (quoting *Medlin* [*v. Allied Inv. Co.*], 398 S.W.2d at 274). "[T]he outrageousness requirement is an 'exacting standard' which provides the primary 'safeguard' against fraudulent and trivial claims.'" *Id.* (quoting *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)). Nevertheless, given the allegations in Mr. MacDermid's complaint, and given the fact that we must construe them liberally and in a light favorable to the plaintiff, we reverse the magistrate judge's 12(b)(6) dismissal of MacDermid's outrageous conduct claims and remand for further proceedings.

488 F.3d 721, 729-32 (italics and footnote in original). Footnote 1 in the material quoted above

reads as follows:

12

At oral argument, counsel for Mr. MacDermid vociferously denied having *admitted* that Ms. MacDermid's application for a credit card over the internet, using her husband as co-obligor, was a criminal offense. We side with the Appellant on this issue, and find Discover's suggestion – both in its brief and at oral argument – that Ms. MacDermid was *per se* criminally liable for credit card fraud to be not only premature given the 12(b)(6) stage of the proceedings, but also quite likely erroneous. It is our understanding from the limited record on this point that at most, Mr. MacDermid called Discover when he initially found out about what his wife had done, at which point he was asked if he wanted to pursue a fraud allegation (e.g., by filling out the proper affidavit), and he then *specifically declined* to pursue such action. . . .

488 F.3d at 732 (italics in original).

As discussed above, this Court's dismissal of the outrageous conduct claim was a 12(b)(6) dismissal. Following the Sixth Circuit's remand, the parties conducted additional discovery and Defendant filed the instant Motion for Summary Judgment.

## IV.   Analysis

### A.  Summary Judgment Standards

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for Summary Judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548,

13

2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

## B. Outrageous Conduct

Plaintiff avers that, in its attempt to collect a debt purportedly owed it, Defendant's "false" description of the law, threats of criminal prosecution, and threats of civil litigation, constitute outrageous conduct and intentional infliction of emotional distress that proximately caused decedent's death by suicide. Docket No. 1.

In Tennessee, the law is well-settled that outrageous conduct and intentional infliction of emotional distress are not two separate torts, but rather, two different names for the same cause of action. *See, e.g., Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997) (citations omitted). In

14

order to sustain a cause of action for outrageous conduct, Plaintiff must establish that, (1) the conduct complained of was intentional or reckless; (2) the conduct was so outrageous that it is not tolerated by a civilized society; and (3) the conduct resulted in serious mental injury. *Id.* at 622.

The first element requires that the defendant "intend to cause emotional distress to the plaintiff or act in reckless disregard of that consequence to the plaintiff." *Doe v. Roman Catholic Diocese of Nashville*, 2003 WL 22171558, at *7 (Tenn. Ct. App. Sept, 22, 2003)(*citing Bain*, 936 S.W.2d at 622). With regard to the second element, as the court in *Medlin v. Allied Inv. Co.* articulated:

> d. Extreme and Outrageous Conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct is characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

398 S.W.2d 270, 274 (Tenn. 1966) (*quoting* Restatement (Second) of Torts § 46, comment d (1965)).

Additionally, this Court must follow the law set forth by the Sixth Circuit in its Opinion in this case. As one noted authority has stated:

> Appellate courts often remand a case to the lower federal courts for further proceedings. It is often stated that the decision of an appellate court on an issue of law becomes the law of the case on

15

remand.  This is the almost universal language describing the law determined by the mandate.  Although this terminology has been widely adopted, the Supreme Court has noted that the mandate rule is not, strictly speaking, a matter of law of the case.  The nondiscretionary aspect of the law of the case doctrine is sometimes called the "mandate rule" and this terminology is more precise than the phrase "law of the case."  On remand, the doctrine of the law of the case is rigid; the district court owes obedience to the mandate of the Supreme Court or the court of appeals and must carry the mandate into effect according to its terms.

**Moore's Federal Practice 3d** § 134.23[1][a], p. 134-58 to 59.

### 1.  Plaintiff's claims in his capacity as Administrator of Decedent's Estate.

Defendant argues that Plaintiff cannot recover in his capacity as administrator of Mrs. MacDermid's estate.  Defendant's main argument here is that Mrs. MacDermid's conduct was "indeed criminal," and, therefore, it was not outrageous for Defendant to threaten her with criminal prosecution.  Docket No. 85, p. 19-20.  In support of this position, Defendant argues: (1) the application for the DiscoverCard contains a specific certification that the information being submitted is true and accurate; (2) an application requesting issuance of a Discover credit card in a party's name without that party's consent or knowledge is a violation of the terms of use of the Discover website; (3) the Complaint admits that Mrs. MacDermid filled out the application without Plaintiff's "knowledge or permission"; and (4) a police report was filed because of Mr. MacDermid's insistence that fraud had taken place and that he had not consented to the credit cards being issued in his name.  Docket No. 85, p. 19-20.  Defendant argues that the conduct at issue has been "criminalized" by T.C.A. § 39-16-303, which provides that "[a] person commits the offense of using a false identification who, for the purpose of obtaining goods, services or privileges to which such person is not otherwise entitled or eligible, uses a false identification."  *Id.*, p. 20.

16

As is discussed above, Defendant made the same basic argument – that Mrs.

MacDermid's conduct was indeed criminal – before the Sixth Circuit. While Defendant may not

have made exactly the same arguments before the Sixth Circuit, this Court, in analyzing

Defendant's arguments, must be guided by the following language from the Sixth Circuit's

Opinion:

> While Discover is correct that it was actually owed the debt in
> question, we disagree with its contention that Mrs. MacDermid
> was necessarily criminally liable for credit card fraud. As such,
> <u>Mr. MacDermid has at least stated a claim for outrageous conduct</u>
> <u>based on Discover's threats of criminal prosecution for failure to</u>
> <u>pay a purely civil debt</u>.

488 F.3d at 729 (underlining added).

> Namely, because his complaint alleges false threats by Discover
> employees of *criminal* prosecution – i.e., words to the effect of, "if
> you don't pay up I'll have the district attorney take a little trip to
> your house" – his case may be distinguished from most of the
> Tennessee regarding creditors' attempts to collect a debt justified
> or unjustified.

488 F.3d at 731.

> Yet a wife's submission of her husband's name and social security
> number to obtain a credit card (which appears to have been all that
> was required in this instance), even if she does so without his
> permission, does not necessarily constitute fraud.

*Id.*

> At oral argument, counsel for Mr. MacDermid vociferously denied
> having *admitted* that Mrs. MacDermid's application for a credit
> card over the internet, using her husband as co-obligor, was a
> criminal offense. We side with the Appellant on this issue, and
> find Discover's suggestion – both in its brief and at oral argument
> – that Mrs. MacDermid was *per se* criminally liable for credit card
> fraud to be not only premature given the 12(b)(6) stage of the
> proceedings, <u>but also quite likely erroneous</u>.

488 F.3d at 732 n.1 (underlining added).

The Sixth Circuit plainly did not consider Mrs. MacDermid's actions to be "fraudulent per se" so as to give rise to criminal liability. Defendant has presented no new, relevant evidence to this Court to show that Mrs. MacDermid's conduct was criminal. Even if Mrs. MacDermid did violate the terms of use of the Discover website, Defendant has not shown that that is a criminal offense. Moreover, Defendant's argument that a police report was filed because of Mr. MacDermid's insistence that fraud had taken place does not establish criminal conduct upon the part of Mrs. MacDermid.

With regard to a possible violation of T.C.A. § 39-16-303, the Court notes that Defendant cited this statute and made the same argument in its Brief before the Sixth Circuit. Defendant's Brief, *MacDermid v. Discover Financial Services*, No. 06-5792, in the U.S. Court of Appeals for the Sixth Circuit, p. 22-23. While the Sixth Circuit did not specifically address that statute in its Opinion, this Court must conclude that the Sixth Circuit was aware of Defendant's argument on this point and rejected it.

Defendant also argues that liability for outrageous conduct cannot be based upon its alleged threats of civil litigation against Mrs. MacDermid. Plaintiff's response to the instant Motion for Summary judgment simply does not respond to this argument or address this issue. Therefore, the Court concludes that there is no genuine issue as to any material fact and that Defendant is entitled to a judgment as a matter of law with regard to any claims asserted by Plaintiff that Defendant's threats of civil litigation against Mrs. MacDermid constitute outrageous conduct.

Defendant next argues that both Mr. and Mrs. MacDermid had actual knowledge that no criminal prosecution was going to be pursued. Docket No. 85, p. 20-21. In support of this

18

argument, Defendant cites pages 24-25 of Mr. MacDermid's deposition. Those pages state as follows:

> Q. What did she –
>
> A. I didn't record any specific one that she heard. To my knowledge, she heard them all.
>
> Q. How do you know that she heard them all?
>
> A. Again, based on conversations, coming back and forth as to what was said or whatever.
>
> Q. That's what I'm trying to get at. She was –
>
> A. Yeah, I don't know which ones other than, you know, as I've stated in there that she had this tremendous fear of going to jail and a tremendous feeling of guilt because of all the crap that went on with the merchants. And she was aware that they had claimed fraud; "they" being Discover.
>
> And she was aware that the police report had been filed. And I think, further, that she was aware that I went to the Sheriff's department to discuss it with him.
>
> Q. How was she aware that you went to the Sheriff's department?
>
> A. I told her. And when I came back, I told her that they said there was no case and that they would do nothing about it.
>
> Q. Did you also tell your wife that Discover had threatened that she would go to jail?
>
> A. She heard that from the tape.
>
> Q. Well, did you discuss with your wife that that's what Discover had said?
>
> A. My discussion with her regarding the jail was that she would not go to jail. You know, to try and convince her that there was no case with the situation of fraud and extortion.
>
> Q. But you talked to your wife about Discover's threats that she

19

was going to go to jail?

A.  Not in that context.  Never in that context.  Meaning, I never
threatened her that she would go to jail or intimated that she would
go to jail.

Q.  No, that's not what I said.  I said did you discuss with her
Discover's threats that she was going to go –

A.  Yes.

Q.  – jail?

Docket No. 85-1, p. 24-25.

It is unclear exactly when Mr. MacDermid told his wife that the Sheriff had said there

was "no case."  At some point, however, as Mr. MacDermid testified, Mrs. MacDermid had this

tremendous fear of going to jail . . . ."  *Id.*, p. 24.  Under these circumstances, the Court simply

cannot conclude that the Sheriff's statement completely counteracted the alleged outrageous

conduct of Defendant, or that Mrs. MacDermid did not suffer serious mental injury prior to the

time her husband told her that criminal charges would not be pursued.

Defendant also raises several arguments in its Reply (Docket No. 98) that should be

addressed.  Defendant argues that Plaintiff's response erroneously refers to the issuance of a

"joint" credit card to Plaintiff and decedent.  *Id.*, p. 3-4.  Defendant argues in part, "The account

opened in the name of Donald MacDermid was <u>not</u> a joint account, but was an individual

account for Donald MacDermid which listed Mrs. MacDermid as an authorized user of that

account."  *Id.*, p. 4 (underlining in original).  Defendant's Statement of Undisputed Material

Facts, however, shows that Mrs. MacDermid submitted "several applications," that Mr.

MacDermid's name was listed as a "co-applicant" on "the application," that Mrs. MacDermid

applied for two more cards in Mr. MacDermid's name, and that "Discover issued the requested

20

credit cards to Mrs. MacDermid." Plaintiff admitted all these facts. *Id.* Docket No. 95. If Mr. MacDermid's name was listed as a "co-applicant," Mrs. MacDermid apparently was also a "co-applicant. The Court concludes that there is a genuine issue as to material fact concerning whether the credit cards were "joint."

Defendant's Reply also seeks to cast doubt upon Ms. Gilmore's statements to the MacDermids because Plaintiff has not put a transcript of any tape-recorded phone calls into evidence, and the tape recordings have never been authenticated as required by Fed. R. Evid. 901. *Id.*, p. 4-5. This argument overlooks the fact that Plaintiff has filed his own Affidavit concerning this conversation, which sets forth Mrs. Gilmore's statements. Docket No. 61.

Plaintiff also argues:

> In addition, under Tennessee law, a person commits the crime of fraudulent use of a credit card who uses a credit card for the purpose of obtaining property, credit, services or anything else of value with knowledge that the use of the card is unauthorized by the person to whom the credit card is issued. T.C.A. § 39-14-118(b)(4). Again, nothing in the Response indicates that the conduct of Mrs. MacDermid would not fall under this statute as well.

Docket No. 98, p. 7-8.

T.C.A. § 39-14-118(b)(4) provides as follows:

> A. A person commits the crime of fraudulent use of a credit or debit card who uses, or allows to be used, a credit or debit card or information from such card, for the purpose of obtaining property, credit, services, or anything else of value with the knowledge that:
>
> . . .
>
> (4) For any other reason the use of the card is unauthorized by either the issuer or the person to whom the credit or debit card is issued.

21

As discussed above, there is a genuine issue as to material fact concerning whether the credit cards were "joint." If the credit card was issued to both Mr. and Mrs. MacDermid, it is not clear that "the use of the card [was] unauthorized by either the issuer or the person to whom the credit . . . card [was] issued." Defendant has not shown that it is entitled to a judgment as a matter of law.[4]

## 2. Plaintiff's individual claims

Defendant notes that it is unclear whether Mr. MacDermid brings an outrageous conduct claim in his individual capacity. To the extent that Mr. MacDermid brings this acion in his individual capacity, Defendant argues that: (1) Plaintiff cannot recover because he cannot prove outrageous conduct directed to him; (2) Defendant's threats of civil litigation against Plaintiff himself do not constitute outrageous conduct; (3) Plaintiff himself cannot claim outrageous conduct based upon Defendant's threats to criminally prosecute his wife, because he knew the Sheriff's department would not pursue putting Mrs. MacDermid in jail; and (4) Plaintiff cannot prove that Defendant's conduct resulted in serious mental injury to him. Docket No. 85, p. 15-18.

It appears that Mr. MacDermid does seek to raise a claim for outrageous conduct in his individual capacity, which is based upon Defendant's threats of jail and criminal prosecution directed to him. Docket No. 91, p. 5. Mr. MacDermid also takes the position that he "experienced severe emotional upheaval and anxiety." *Id.* As discussed above, the Sixth Circuit

---

[4] The Sixth Circuit stated in its Opinion, "It would seem that something beyond the pleadings is required for Discover to show that Mrs. MacDermid had in fact committed fraud against the Company – for example, via a copy of the on-line application and an explanation of the material misrepresentations contained therein." 488 F.3d at 731-32. For whatever reason, Defendant did not follow this suggestion.

recognized that a claim could be stated for outrageous conduct based upon Defendant's threats of criminal prosecution for failure to pay a purely civil debt. Ms. Gilmore's threat to have the authorities "take a little trip out to your house," could have been a threat to both Mr. and Mrs. MacDermid.

Plaintiff's response to the instant Motion for Summary Judgment does not, however, address any other claims by Mr. MacDermid in his individual capacity. Therefore, Defendant's Motion for Summary Judgment will be denied with regard to Plaintiff's individual claim that Defendant's threats of criminal prosecution of Mr. MacDermid constituted outrageous conduct. The Motion for Summary Judgment, however, will be granted with regard to any other claims raised by Mr. MacDermid in his individual capacity.

### C.  Punitive Damages

Defendant argues that there is no factual foundation in the record that would support an award of punitive damages, and that Plaintiff must prove such damages by clear and convincing evidence. Defendant argues, "There is no evidence in the record that Discover took any action to harm either Mr. or Mrs. MacDermid intentionally, fraudulently, maliciously, or recklessly." Docket No. 85, p. 21-22. While making this statement, however, Defendant notes that the Tennessee Supreme Court has stated, "A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.*, p. 21, *citing Hodges v. S.C. Toof & Co.,* 833 S.W.2d 886, 901-02 (Tenn. 1992). Viewing the evidence in the light most favorable to Plaintiff, there is evidence in the record that Mrs. Gilmore acted intentionally when she threatened to have the authorities come to their home.

### IV.  Conclusion

23

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket No. 84) will be GRANTED IN PART and DENIED IN PART.  It will be granted to the extent that Plaintiff's individual claims against Defendant will be dismissed, except for his claim based upon Defendant's threats of jail and criminal prosecution directed to him.  It will also be granted to the extent that Plaintiff's claims concerning threats by Defendant of civil litigation against Mrs. MacDermid will be dismissed.  In all other respects the Motion for Summary Judgment will be denied.

An appropriate Order will enter.

_____
E. CLIFTON  KNOWLES
United States Magistrate Judge